UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK CAVANAUGH, not individually, but as the Receiver of the Overall Receivership Estate,

    Plaintiff

vs.

MATTHEW A. COHEN and LESLIE COHEN,

    Defendants.

Case No. 15-cv-10262

## COMPLAINT

Patrick Cavanaugh, not individually, but solely in his capacity as receiver of the Overall Receivership Estate ("Overall Receiver"), by and through undersigned counsel, respectfully states as follows for his Complaint against Matthew A. Cohen ("M. Cohen") and Leslie Cohen ("L. Cohen," and together with M. Cohen, the "Cohens" or the "Defendants") to avoid and recover fraudulent transfers, and for other relief as requested herein.

## INTRODUCTION

1. This case arises out of a massive fraud perpetrated by Nikesh Patel ("Nikesh"), among others, through First Farmers Financial, LLC ("FFF" or the "Debtor"), which Nikesh utilized to fraudulently obtain millions of dollars from the sale of fictional loans that were purportedly guaranteed either by the U.S. Small Business Administration ("SBA") or the U.S. Department of Agriculture ("USDA") Rural Development Program. After fraudulently obtaining these funds, Nikesh directed FFF to improperly transfer millions of dollars to insiders, relatives and employees of entities that he owned and/or controlled, such as Vision Hospitality Construction, LLC ("Vision"). In this case, Nikesh directed FFF to send close to $500,000 to the Cohens to allow them to buy a home.

2. In or around November 2013, Vision hired M. Cohen to be in charge of business development at Vison. Approximately four months after hiring M. Cohen, FFF gave M. Cohen approximately $476,000 as an "advance" on yet to be earned distributions that M. Cohen or M. Cohen's corporation might receive in the future from Vision, and the Defendants used that large advance to pay for their new home. Shortly after buying their home, the Cohens sold it and walked away with $570,000. Neither M. Cohen nor his corporation ever earned or were otherwise entitled to any bonus or distributions from FFF, Vision, or any of its or their affiliated entities, and the Cohens never repaid any monies to FFF.

3. At bottom, the Defendants were the very willing recipients of a $476,000 fraudulent transfer that they used to buy their new home, and then sell it for a profit less than a year later. The Overall Receiver now seeks, among other relief, to recover that fraudulent transfer, obtain additional monetary damages from the Cohens, and place a constructive trust on the assets of both M. Cohen and L. Cohen.

## THE PARTIES

4. Pursuant to the *Agreed Order Clarifying, Modifying and Expanding the Duties of Receiver Michael Nanosky and to Appoint an Overall Receiver and Regarding Payments to Attorneys and Other Professionals and Related Items* dated April 23, 2015 ("Amended Receiver Order")[1] [Dkt. No. 122], the Overall Receiver is the duly Court-appointed receiver of the all of the assets of FFF other than those assets entrusted to the Nanosky Receivership Estate (*Id.*, ¶¶ 22-24.) For jurisdictional purposes, the Overall Receiver is a citizen of the State of Illinois.

5. M. Cohen and L. Cohen are individuals and citizens of Florida, and currently reside at 858 Hollywood Blvd., Hollywood, FL 33019.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Amended Receiver Order.

**JURISDICTION**

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367(a). This Court also has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 754, which has been complied with, to the extent necessary, to perfect the Overall Receiver's and this Court's jurisdiction over the Defendants.

7. In addition, and in the alternative, this Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and because the action is between citizens of different States.

8. This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1692.

**FACTUAL BACKGROUND**

**A. The Fraudulent Scheme**

9. In 2012, Nikesh and Timothy Fisher ("Fisher") formed FFF, and each became 50% owners of FFF. Nikesh, at all relevant times, was the managing member of FFF, and served as FFF's President and Chief Executive Officer. Fisher, at all relevant times, was also a member of FFF and served as FFF's Chief Operating Officer and Executive Vice-President.

10. Beginning in or around January 2012, if not earlier, Nikesh and Fisher initiated the process of securing USDA approval of FFF as a non-traditional lender. In connection with that approval process, Fisher provided the USDA with an application for USDA approval that contained fraudulent financial information about FFF that Fisher had secured through a confederate, purported to be from a large financial institution and purported to show that FFF had over $22 million on deposit (and therefore the liquidity to be approved as a USDA-approved

lender). However, in fact, the financial information Fisher provided, and FFF's alleged access to liquidity, were a complete fiction.

11. Nikesh and Fisher otherwise conspired to dupe the USDA into approving FFF as a non-traditional lender by making a variety of false and misleading statements regarding FFF's liquidity and ability to conform to USDA policies, rules and regulations regarding the Rural Development Loan Program.

12. Nikesh and Fisher used FFF's status as a USDA-approved lender to perpetrate the fraudulent scheme (the "FFF Fraud"). FFF was, at all relevant times, a USDA-approved non-traditional (non-bank) lender operating in Florida and Georgia.

13. As a USDA-approved lender, FFF purportedly originated loans, represented that those loans were secured with USDA guarantees, and sold the allegedly guaranteed portions of those loans through asset managers and/or investment advisors, including a company named Pennant Management, Inc. ("Pennant"). FFF assigned the alleged USDA guarantee and that portion of the purported loan to the asset manager or investment advisor, and allegedly serviced said loans for a fee. The asset managers and investment advisors, like Pennant, were acting solely in their capacity as agents for their clients, who were the actual investors and funded the acquisition of the loans from FFF. Pennant did not purchase the loans with any of its own funds, did not have a direct interest in any of the acquired loans and was not a trustee for any of its clients that purchased the FFF Loans (as defined below). Rather, Pennant acted solely as an investment advisor for its clients.

14. At all relevant times, Pennant was in the business of using its clients' funds to acquire, through a secondary market, USDA and SBA guaranteed loans originated by third-party USDA or SBA approved lenders such as FFF.

15. Nikesh and Fisher, through FFF, sold Pennant's clients non-existent "loans" that were purportedly guaranteed by the USDA, when no such loans actually existed. Indeed, beginning in June 2013 and continuing through August 2014, Pennant used its clients' money to fund and acquire the federally guaranteed portions of 26 separate "loans" originated by FFF, reflecting alleged loans to a variety of borrowers in Florida and Georgia (the "FFF Loans"). Pennant wired its clients' money for each such acquired loan from its Lisle, Illinois office to FFF.

16. Nikesh and Fisher conspired and consulted regarding each of the 26 fabricated loans, including discussing the amount and the timing of each fraudulent loan. Nikesh created the majority of the fraudulent documents with Fisher forging several of the USDA guarantee signatures and approving each fraudulent loan. Together, Nikesh and Fisher invented each of the 26 "borrowers," printed phony loan documents, forged the signatures of USDA officials on guarantees, sent the fraudulent loan documentation to Pennant and sold close to $180 million in worthless paper to numerous investors through Pennant. Those written representations were false, and were known by Nikesh and Fisher to be false at the time they were made.

17. Thereafter, FFF, under the direction of Nikesh and Fisher, further perpetrated the fraudulent scheme by using a portion of the proceeds of the fraud to remit the monthly principal and interest payments to Pennant on the FFF Loans as those payments became due.

18. Nikesh and Fisher, in the name of FFF, were able to maintain this fraud by pocketing almost all of the proceeds paid through Pennant for the FFF Loans, and using such proceeds of the fraud to purchase real estate investment properties, personal residences, luxury vehicles, jewelry and the like. As discussed in greater detail below, fraudulent proceeds were transferred by and through FFF to Cohen.

### B. FFF's Financial Condition

19. On April 23, 2015, the Overall Receiver was appointed by the Court and tasked with "marshaling, recovering, administering, managing, conserving, protecting, maintaining, marketing and liquidating [the Overall Receivership Estate] for the benefit of the Distribution Participants."

20. At all relevant times, Nikesh and Fisher operated FFF for the sole purpose of perpetrating the fraudulent scheme. As a result, FFF was never legally solvent or otherwise able to pay its debts and liabilities as they became due. Any monies purportedly held in the name of FFF were obtained as a result of the FFF Fraud and were simply ill-gotten gains rather than actual profits resulting from a legitimate business enterprise.

21. Because of the fraudulent activity, substantial assets were quickly diverted from FFF and, at all times relevant to this Complaint, FFF's liabilities were substantially in excess of any of its assets.

### C. The Fraudulent Transfer, through FFF, to the Cohens

22. On or about November 1, 2013, Vision hired M. Cohen to be its Executive Vice-President of Business Development and Senior Estimator. On information and belief, at or around the same time, Vision also granted Midtown Builders and Consultants, Inc. ("Midtown Builders") a 10% membership interest in Vision. On information and belief, M. Cohen is the 100% shareholder in Midtown Builders.

23. M. Cohen's annual salary at Vision was $200,000/year, and his employment agreement did not indicate that M. Cohen was eligible for any bonuses or other distributions.

24. On or about February 20, 2014, FFF wire transferred $476,301.82 from its account at BMO Harris Bank to an account held by Real Estate Closing Solutions, LLC (the

"Fraudulent Transfer"). The special instructions in the wire transfer indicated that the transfer was for the "Closing For Matt Cohen." On information and belief, FFF sent the Fraudulent Transfer purportedly as an advance on future distributions to M. Cohen and/or to Midtown Builders.

25. On February 21, 2014, the Cohens used the Fraudulent Transfer to purchase a new home located at 9212 Country Bay Ct. in Orlando, Florida (the "Cohen Home"). Less than a year later, on or about January 9, 2015, the Cohens sold the Cohen Home for $570,000 and pocketed 100% of the proceeds from the sale. The Cohens never repaid FFF any monies out of the proceeds from the sale of the Cohen Home or otherwise.

26. Moreover, on information and belief, the Cohen did not report the Fraudulent Transfer as income on their 2014 federal and state tax returns.

**COUNT I – ACTUAL FRAUDULENT TRANSFER AGAINST THE DEFENDANTS PURSUANT TO THE UNIFORM FRAUDULENT TRANSFER ACT § 726.105(1)(a)**

27. The Overall Receiver restates and realleges the allegations set forth in paragraph 1 through 26 above as if fully set forth herein.

28. Section 726.105(1)(a) of the Florida Uniform Fraudulent Transfer Act ("UFTA") provides, in relevant part, that: "A transfer made or obligation incurred by a debtor is fraudulent to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation…with actual intent to hinder, delay, or defraud any creditor of the debtor." § 726.105(1)(a), Fla. Stat. (2014).

29. Nikesh directed FFF to make the Fraudulent Transfer with the actual intent to hinder, delay or defraud FFF's creditors.

30. Nikesh has caused FFF to remove or conceal assets.

31. The Cohens received and retained the Fraudulent Transfer without providing reasonably equivalent value in exchange for such funds.

32. FFF was insolvent when the Fraudulent Transfer was sent and used by the Cohens to purchase the Cohen Home, and FFF did not retain sufficient property to repay its indebtedness to its creditors.

33. Therefore, the Fraudulent Transfer constitutes an actual fraudulent transfer under Section 726.105(1)(a) of the UFTA.

34. The Overall Receiver is entitled to assert the claims to recover the Fraudulent Transfer from the Cohens.

35. The Cohens could not have purchased the Cohen Home without the Fraudulent Transfer, and thus they are not allowed to profit from the sale of the Cohen Home.

WHEREFORE, the Overall Receiver respectfully requests that this Court:

(a) Enter judgment in his favor and against the Defendants in an amount of no less than $570,000;

(b) Order an equitable accounting setting forth: (1) any and all funds used to purchase the Cohen Home; (2) the net proceeds to the Cohens from the sale of the Cohen Home; and (3) the current location of all of the proceeds from the sale of the Cohen Home;

(c) Impose a constructive trust over any and all assets of the Cohens, regardless of how such assets are held by one or both of them, and enjoin the Cohens from dissipating, assigning or transferring any of their assets without authorization from this Court or from the Overall Receiver;

(d) Enter an award in favor of the Overall Receiver for his reasonably attorneys' fees and costs; and

(e) Provide such other and further relief as this Court may deem appropriate.

## COUNT II – CONSTRUCTIVE FRAUDULENT TRANSFER AGAINST THE DEFENDANTS PURSUANT TO THE UNIFORM FRAUDULENT TRANSFER ACT § 726.105(1)(b)

36. The Overall Receiver restates and realleges the allegations set forth in paragraph 1 through 26 above as if fully set forth herein.

37. Section 726.105(1)(b) of the Florida Uniform Fraudulent Transfer Act ("UFTA") provides, in relevant part, that: "A transfer made or obligation incurred by a debtor is fraudulent to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation…without receiving reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." § 726.105(1)(b), Fla. Stat. (2014).

38. At the time that FFF made the Fraudulent Transfer, given the massive debts owed by FFF as a result of the FFF Fraud, FFF was engaged in a business for which its assets were unreasonably small in relation to its business.

39. Alternatively, as a result of the Fraudulent Transfer, FFF knew or reasonably should have known that it had incurred debts beyond its ability to pay as they became due. Specifically, FFF's debts became greater than all of its assets when fairly valued by virtue of amounts transferred, including the Fraudulent Transfer. Indeed, FFF had no substantial assets after deducting the amounts misappropriated through Pennant and through the other assets managers and/or investment advisors.

40. The Cohens received and used the Fraudulent Transfer to buy the Cohen Home without providing reasonably equivalent value in exchange for these funds.

41. FFF was insolvent when the Fraudulent Transfer was made and did not retain sufficient property to repay its indebtedness.

42. Therefore, the Fraudulent Transfer constitutes a constructive fraudulent transfer under Section 726.105(1)(b) of the UFTA.

43. The Overall Receiver is entitled to assert the claims to recover the Fraudulent Transfer as well as the proceeds from the sale of the Cohen Home from the Cohens.

WHEREFORE, the Overall Receiver respectfully requests that this Court:

(a) Enter judgment in his favor and against the Defendants in an amount of no less than $570,000;

(b) Order an equitable accounting setting forth: (1) any and all funds used to purchase the Cohen Home; (2) the net proceeds to the Cohens from the sale of the Cohen Home; and (3) the current location of all of the proceeds from the sale of the Cohen Home;

(c) Impose a constructive trust over any and all assets of the Cohens, regardless of how such assets are held by one or both of them, and enjoin the Cohens from dissipating, assigning or transferring any of their assets without authorization from this Court or from the Overall Receiver;

(d) Enter an award in favor of the Overall Receiver for his reasonably attorneys' fees and costs; and

(e) Provide such other and further relief as this Court may deem appropriate.

### COUNT III – UNJUST ENRICHMENT

44. The Overall Receiver restates and realleges the allegations set forth in paragraph 1 through 26 above as if fully set forth herein.

45. Nikesh directed FFF to make the Fraudulent Transfer, as previously set forth herein. In so doing, FFF conferred a benefit on the Cohens.

46. The Cohens were aware that they were receiving benefits from FFF in the form of the Fraudulent Transfer, and they voluntarily accepted and retained those benefits.

47. The Cohens did not provide any value or consideration to FFF in exchange for receiving the benefits of the Fraudulent Transfer.

48. As set forth in this Complaint, the circumstances, including, but not limited to, the FFF Fraud, are such that it would be inequitable for the Cohens to retain the benefits of the Fraudulent Transfer without paying value for such benefits.

WHEREFORE, the Overall Receiver respectfully requests that this Court:

(a) Enter judgment in his favor and against the Defendants in an amount of no less than $570,000;

(b) Order an equitable accounting setting forth: (1) any and all funds used to purchase the Cohen Home; (2) the net proceeds to the Cohens from the sale of the Cohen Home; and (3) the current location of all of the proceeds from the sale of the Cohen Home;

(c) Impose a constructive trust over any and all assets of the Cohens, regardless of how such assets are held by one or both of them, and enjoin the Cohens from dissipating, assigning or transferring any of their assets without authorization from this Court or from the Overall Receiver;

(d) Enter an award in favor of the Overall Receiver for his reasonably attorneys' fees and costs; and

(e) Provide such other and further relief as this Court may deem appropriate.

                                                      Respectfully submitted,

                                                      Patrick Cavanaugh, not individually, but solely in his capacity as Overall Receiver of the Overall Receivership Estate

Dated: November 12, 2015                    By     /s/  *Richard A. Saldinger*
                                                              One of his attorneys

Steven B. Towbin
Richard A. Saldinger
Allen J. Guon
Shaw Fishman Glantz & Towbin LLC
321 North Clark Street, Suite 800
Chicago, IL  60654
Phone: (312) 541-0151
stowbin@shawfishman.com
rsaldinger@shawfishman.com
aguon@shawfishman.com

*Counsel for the Overall Receiver*